IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| *In re:*<br><br>BATAA/KIERLAND LLC,<br><br>Debtor. | 2:12-cv-01783 JWS<br><br>MEMORANDUM DECISION |
| JPMCC 2007–CIBC 19 EAST<br>GREENWAY, LLC,<br><br>Appellant,<br><br>vs.<br><br>BATAA/KIERLAND LLC,<br><br>Appellee. | On Appeal From<br>U.S. Bankruptcy Court, District of Arizona<br>Hon. Randolph J. Haines, Judge<br>Bankruptcy Case No. 2:11-bk-05850-RJH |

JPMCC 2007–CIBC 19 East Greenway, LLC timely appeals from the Order of the bankruptcy court confirming the Plan of Reorganization proposed by Debtor Bataa/Kierland LLC (hereinafter "Plan"). The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(a), (b)(2)(A) and 1334. This court has jurisdiction under 28 U.S.C. § 158(a)(1), (c)(1)(A).

Dean C. Waldt and Andrew A. Harnish of Ballard Spahr LLP, Phoenix, Arizona. appeared on behalf of the Appellant, JPMCC 2007–CIBC 19 East Greenway, LLC., John J. Hebert, and Philip R. Rudd of Polsinelli PC, Phoenix, Arizona, appeared on behalf the Appellee Bataa/Kierland LLC.

Oral argument was heard on May 28, 2013. The court being fully apprised in the proceeding now enters it decision.

## I.  BACKGROUND/ISSUES PRESENTED

Bataa/Kierland LLC (hereinafter "Debtor") filed a petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code.  After holding a hearing, the bankruptcy court confirmed the plan of reorganization proposed by Debtor, over the objections of JPMCC 2007–CIBC 19 East Greenway, LLC (hereinafter "JPMCC"), the holder of a $28 million secured, pre-petition claim.  JPMCC appeals the confirmation order.

Initially, the property upon which stood an office building was owned entirely by Debtor.  In 2008 the property was divided into two parcels, with Debtor retaining that portion of the subdivided property that included the existing building and approximately 79 surface parking spaces.  The remainder of the property, including a number of surface parking spaces, was conveyed to an affiliate, Bataa/Kierland II (hereinafter "Kierland II").[1]  As part of the subdivision process, Debtor recorded a Declaration of Covenants, Conditions, and Restrictions ("CC&Rs"), in which Debtor reserved an easement in the parking spaces on that portion of the property conveyed to Kierland II. Subsequently, Kierland II developed its property, erecting an office building and a parking garage.  Although Debtor had used some of the parking spaces in the parking garage, Debtor had not paid Kierland II for use of the parking garage prior to the filing of the petition for relief.[2]  During the course of the bankruptcy proceeding Debtor and Kierland II entered into an agreement providing for payment by Debtor for Debtor's use of the parking garage.  Under the terms of that agreement, Debtor was to reimburse

---

[1]  It is undisputed that both Debtor and Kierland II are owned by Bataa Oil, which in turn is owned by the same principals.

[2]  The record reflects that Debtor had, however, paid Kierland II the amount Debtor received from its tenants for the use of the parking garage on a pass-through basis.

Kierland II for Debtor's proportionate share of the cost of constructing the parking garage ($5.16 million), plus its annual *pro rata* share of the operating costs.[3]  Payment of the $5.16 million was deferred until after payment of JPMCC's secured claim and the unsecured creditors' subordinated debenture in the seventh year following confirmation of the plan, effectively deferring payment until the plan had been consummated.  After the proposed plan was filed, but prior to the confirmation hearing, JPMCC filed an adversary action seeking a declaration of the rights of Debtor and Kierland II under the CC&Rs.  The bankruptcy court included the issue raised in the adversary proceeding in the hearing on the plan of reorganization and approved the agreement.

The value of Debtor's property also was an issue in the context of determining the extent to which JPMCC's $28 million claim was secured.  The bankruptcy court accepted the base appraisal by Debtor's expert of $12.5 million, but reduced it to $7.7 million to account for JPMCC's proportionate share of the cost of erecting the parking structure on the Kierland II property.  This left JPMCC with a $20 million unsecured claim to be paid *pro rata* from a $500,000 subordinated debenture.

At some point prior to 2010, Debtor made distributions to its principal, Bataa Oil. These distributions were initially booked by both Debtor and Bataa Oil as inter-company receivables from Bataa Oil to Debtor.  Sixty-eight days prior to the filing of the Chapter 11 petition, $14.9 million of the payments were re-characterized on Debtor's books as equity distributions by Debtor to Bataa Oil.[4]  It is undisputed that the books of Bataa Oil continue to show an inter-company debt owed to Debtor of approximately $15.7 million.

---

[3]  This included Debtor's share of the monthly maintenance and real property taxes.

[4]  Shown on Debtor's books in two parts: $6,990,301 and $7,897,542.

3

As part of the approved plan, Bataa Oil, as the Debtor's principal, injected $350,000 into Debtor which the bankruptcy court deemed sufficient "new value" to satisfy the absolute priority rule.[5]  The confirmed plan also permitted Debtor to retain $729,427 in cash collateral proceeds held at the time of confirmation.

## II.  STANDARD OF REVIEW

A district court sitting in its bankruptcy appellate capacity reviews findings of fact for clear error and conclusions of law *de novo*.[6]  The bankruptcy court's findings of fact must be accepted "unless the court is left with the definite and firm conviction that a mistake has been committed."[3]  "Mixed questions of fact are reviewed de novo."[4] The interpretation of a contract in this case is governed by Arizona law, and is reviewed de novo.[5]  A bankruptcy court's determination of whether a proposed plan of reorganization is feasible, i.e., not likely to be followed by liquidation or further reorganization, is one of fact reviewed for clear error.[6]

---

[5]  11 U.S.C. § 1129(b)(2)(b)(II); *see Bonner Mall P'ship v. U.S. Bancorp Mortgage Co.* (*In re Bonner Mall P'Ship*), 2 F.3d 899, 905–17 (9th Cir. 1993).

[6]  *Decker v Tramiel* (*In re JTS Corp.*), 617 F.3d 1102, 1086–87 (9th Cir. 2010) (citing *In re Strand*, 375 F.3d 854, 857 (9th Cir. 2004)).

[3]  *Id.* (quoting *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009) (internal quotation marks omitted)).

[4]  *Id.* (quoting *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998) (internal quotation marks omitted)).

[5]  *Starrag v. Maersk, Inc.*, 486 F.3d 607, 611 (9th Cir. 2007).

[6]  *Harbin v. IndyMac Bank, FSB* (*In re Harbin*), 486 F.3d 510, 517 (9th Cir. 2007).

# III.  DISCUSSION

## A.  Procedural Issues

During the course of the proceedings, JPMCC initiated an adversary action

challenging the post-petition parking agreement between Debtor and Kierland II.  As

noted above, the bankruptcy court addressed that question in the confirmation hearing

and approved the parking agreement as part of the plan confirmation process.  JPMCC

challenges the decision of the bankruptcy court on two procedural grounds:  (1) that the

bankruptcy court lacked jurisdiction to enter the final order under *Stern*;[7] and (2) that

under Federal Rule of Bankruptcy Procedure 7001, the controversy over the

interpretation of the CC&R's and the parking agreement was required to be determined

in an adversary proceeding, not as part of plan confirmation.  For the reasons that

follow, this court disagrees with JPMCC on both points.

In *Stern*, the widow brought an adversary action in her Chapter 11 proceeding to

recover damages for her stepson's alleged tortious interference with her expectancy of

an inheritance or gift from her deceased husband as a compulsory counterclaim to the

stepson's claim against the estate.  The bankruptcy court entered judgment for the

widow, and the stepson appealed.  The Supreme Court held that the bankruptcy court

lacked authority under Article III to enter final judgment on the widow's counterclaim.

At the heart of *Stern* was the determination that, even though the counterclaim in

*Stern* was a core proceeding under the Bankruptcy Code, the widow's claim arose

under state common law and was between two private parties, it did not flow from the

---

[7]  *Stern v. Marshall*, 131 S. Ct. 2594 (2011).

federal statutory scheme, was not a matter of public right, and it would not necessarily be resolved by the process of ruling on the stepson's proof of claim in the bankruptcy proceedings.[8]

The issue in this case is significantly different.  Unlike *Stern*, resolution of the extent to which Debtor had access to the parking spaces located on the Kierland II property was necessarily integral to the resolution of JPMCC's claim, i.e., the extent to which the claim was allowed as a secured claim.  This court agrees that, in light of *Stern*, the authority of bankruptcy courts over state-law issues is somewhat unsettled.  However, this court finds persuasive the reasoning used by the bankruptcy court in the Southern District of Texas when it determined that the dischargeability of a creditor's claim fell outside the scope of *Stern*:

> The Court concludes, however, that it may exercise authority over essential bankruptcy matters under the "public rights" exception.  Under *Thomas v. Union Carbide Agric. Prods. Co.*, a right closely integrated into a public regulatory scheme may be resolved by a non-Article III tribunal.  473 U.S. 568, 593, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985).  The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts."  *Cent. Va. Cmty. Coll. v. Katz,* 546 U.S. 356, 363–64, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006); *see N. Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 71, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'").  *But see Stern,* 131 S.Ct. at *2614 n. 7 ("We noted [in *Granfinanciera*] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'").[9]

---

[8]  *Id.* at 2611–18.

[9]  *Husky Intern'l Elec., Inc. v. Ritz* (*In re Ritz*), 469 B.R. 623, 631 (Bankr.. S.D. Tex. 2011).

The court then went on to explain:  "When a bankruptcy court determines the extent of a creditor's [secured] claim, the court simply decides that a particular creditor is entitled to something more than the creditor would otherwise get out of the bankruptcy bargain.  Such determinations are inextricably tied to the bankruptcy scheme and involve the adjudication of rights created by the Bankruptcy Code."[10]

The Texas bankruptcy court's decision is consistent with the recent decision by the Ninth Circuit rejecting the argument that a fraudulent conveyance claim (falling within the ambit of *Stern*) was indistinguishable from the preferential transfer claim that was at issue in *Katchen*:[11]

> That is wrong for two reasons. First, the dispositive distinction between the claims in *Stern* and *Katchen* was that in *Katchen*, the trustee's preference action "would necessarily be resolved in the claims allowance process" because the defendant had filed a proof of claim against the bankruptcy estate.  *Stern*, 131 S.Ct. at 2618.  The preference action necessarily had to be resolved in the course of deciding whether to allow the defendant's claim on the estate.  By contrast, Vickie Marshall's counterclaim in *Stern* required the bankruptcy court to "make several factual and legal determinations that were not disposed of in passing on objections to Pierce's proof of claim for defamation."  *Id.* at 2617 (internal quotation marks omitted). "There thus was never reason to believe that the process of ruling on Pierce's proof of claim would necessarily result in the resolution of Vickie's counterclaim."  *Id.* at 2617–18.
> Second, a rule that classified any federal-law claim as a "public right" would render *Stern* internally contradictory.  Assume that the *Stern* Court's observation that "Vickie's claim . . . is in no way derived from or dependent upon bankruptcy law" was the sole basis by which the Court distinguished the counterclaim in that case from the preference action in *Katchen.*  If that were so, the *Stern* Court's characterization of the holding in *Granfinanciera*—that "Congress could not constitutionally assign resolution

---

[10]  *Id.* at 632.

[11]  *Katchen v. Landy*, 382 U.S. 323, 329–30, 332-33 (1966) (holding that bankruptcy referees acting under the Bankruptcy Acts of 1898 and 1938 could exercise summary jurisdiction over a voidable preference claim brought by a bankruptcy trustee against a creditor who filed proof of claim in the bankruptcy proceeding).

of the fraudulent conveyance action to a non-Article III court," 131 S.Ct. at
2614 n.7—would be incoherent, because the claim in *Granfinanciera* arose
under § 548 of the Bankruptcy Code.  *See* 492 U.S. at 36, 109 S.Ct. 2782.
*Granfinanciera* involved a federal-law claim, and *Stern* involved a
state-law claim.  But *Stern* held that both claims required an Article III court.
Thus, the only principled basis on which to distinguish *Katchen* from *both*
*Stern* and *Granfinanciera* is that *Katchen* involved a claim against a creditor
that necessarily had to be resolved in the course of the claims-allowance
process, and *Stern* and *Granfinanciera* did not.[12]

Just as resolution of a preferential transfer to a creditor was necessarily resolved as a

part of the claims allowance process, the question of the value of the property in which

a secured creditor claims an interest is integral to determining the extent of the

creditor's secured claim.  Furthermore, resolving the question of the scope of the

easement constituted the *de facto* resolution of Kierland II's scheduled (but unfiled)

$4,168,000 contingent/unliquidated/disputed claim.[13]  This court finds that the

Bankruptcy Court had jurisdiction to enter a final judgment on the question of the scope

of Debtor's rights under the easement.[14]

JPMCC also contends that under Federal Rule of Bankruptcy Procedure 7001,

the controversy over the interpretation of the CC&R's was required to be determined in

---

[12] *Executive Benefits Ins. Agency v. Arkinson* (*In re Bellingham Ins. Agency, Inc.*), 702
F.3d 553, 564 (9th Cir. 2012).

[13] Docket 18-4 at 3.

[14] Any other interpretation would render all objections to creditor claims subject to *Stern*
for the simple reason that in general creditor's claims are initially determined by reference to
state law.  *See Travelers Cas. and Sur. Co. of America v. Pacific gas Co.* 549 U.S. 443, 444
(2007) (noting that bankruptcy courts are required to consult state law in determining the validity
of most claims); *Butner v. United States*, 440 U.S. 48, 54 (1979) (noting that "Congress has
generally left the determination of property rights in the assets of a bankrupt's estate to state
law").

an adversary proceeding, not as part of plan confirmation.  This issue is reviewed *de novo*.[15]  JPMCC relies principally upon the Ninth Circuit's decision in *Enewally*:

> Here, during plan confirmation and modification, the bankruptcy court specifically reserved the question at issue because it had been raised via an adversary proceeding. "[I]f an issue must be raised through an adversary proceeding it is not part of the confirmation process and, unless it is actually litigated, confirmation will not have a preclusive effect."  [Citations omitted.]  Thus a Chapter 13 plan confirmed while an adversary proceeding was pending would not have *res judicata* effect on the adversary proceeding.[16]

In a subsequent case involving the effect of a confirmed Chapter 13 plan on the dischargeability of a debt, the Ninth Circuit declined to follow *Enewally* considering what it said to be *dicta* and inapplicable where, as here, the bankruptcy court actually litigated the question in the confirmation process.

> *Whelton* appears to have been misled by a stray remark in one of our opinions, *Enewally v. Washington Mutual Bank* ( *In re Enewally* ), 368 F.3d 1165, 1173 (9th Cir.2004), to the effect that "the confirmed plan has no preclusive effect on issues that must be brought by an adversary proceeding." This statement was correct in the circumstances presented in *Enewally*, where "the bankruptcy court specifically reserved the question at issue [during plan confirmation] because it had been raised via an adversary proceeding." *Id.* It is true, of course, that a plan can have no preclusive effect on matters that have been specifically reserved for resolution by way of an ongoing adversary proceeding.  We had no occasion in *Enewally* to consider the situation where there is no adversary and the case is resolved entirely by confirmation of the plan. Anything *Enewally* has to say as to matters not presented in that case is, in any event, dicta and thus not binding on us. Reading *Enewally* broadly to speak to that hypothetical situation would also bring it into conflict with *Pardee,* which addresses precisely this issue.[17]

---

[15] *American Sports Radio Network, Inc. v. Krause* (*In re Krause*), 546 F.3d 2070, 1073 (9th Cir. 2008).

[16] *Enewally v. Washington* (*In re Enewally*) 368 F.3d 1168, 1173 (9th Cir. 2004).

[17] *Espinoza v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1199 n.3 (9th Cir. 2008).

There is no reason for this court to blindly follow *Enewally* and ignore *Espinosa*. This conclusion is bolstered by the fact that JPMCC has not identified any substantive or procedural right that it might have had in the adversary proceeding that was unavailable in the plan confirmation hearing.

### B.  Interpretation of the CC&Rs

Central to the controversy before this Court is the extent, if any, to which Debtor must reimburse Kierland II for the use of the parking structure.  It is undisputed that the CC&R's provide that "there will be no material charge for parking in the common area without the prior written consent of all Owners or unless otherwise required by the law."[18]  JPMCC disputes the Bankruptcy Court's interpretation of the CC&Rs to the extent that it found that the parking garage was a "building" excluded from the definition of a "common area."  JPMCC argues that the term "buildings" encompasses solely the office building on Kierland II property, not the parking structure.  JPMCC contends that: (1) the Bankruptcy Court's interpretation nullified the clear and unambiguous language of the CC&Rs; and (2) contradicted the testimony of the principal (Mr. Calvin) that it was his intent to have the easement extend to the parking garage.  According to JPMCC the Bankruptcy Court should have considered the testimony as parole evidence to the extent that it deemed the CC&Rs ambiguous.

As this court reads the bankruptcy court's decision, that court did not find the language in the CC&Rs ambiguous, for in interpreting the document the Bankruptcy Court referred solely to the terms of the CC&Rs.  Of course, "[t]he construction of a

---

[18]   Decision re: Confirmation of Amended Plan [Docket 19-4 at 3].

contract is a question of law where the terms of the agreement are clear and unambiguous."[19]  "[But,] an appellate court [is not] bound by a lower court's conclusions with respect to an ambiguity.  It may independently determine the presence of an ambiguity in a contract."[20]  Under Arizona law, a contract is not ambiguous merely because the parties cannot agree to its meaning; rather, an agreement is ambiguous only if the language can reasonably be construed in more than one sense and the interpretation cannot be determined within the four corners of the instrument.[21]  Where there is an ambiguity, the trier of fact must determine "the intent of the parties, based on extrinsic evidence."[21]

   As pointed out by JPMCC, the linchpin for the bankruptcy court's decision requiring payment to the Debtor for use of parking spaces in the parking structure erected on the Kierland II property was its finding that the CC&Rs excluded the parking structure from the "Common Area" It did so on the basis that the parking structure was a "Building" as that term is used in the document.  The problem is that the definition of Common Areas expressly says that it includes parking areas.  This creates an ambiguity, a proposition which is supported by the additional arguments made by JPMCC in its opening brief.  Given the existence of the ambiguity, the bankruptcy court

---

[19]  *Smith v. Melson, Inc.*, 659 P.2d 1264, 1266 (Ariz. 1983).

[20]  *Beaudreau v. Borg-Warner Acceptance Corp.*, 616 F.2d 1077, 1079 (9th Cir. 1980) (citing *Polk v. Koerner*, 533 P.2d 660 (Ariz. 1975); *Federal Ins. Co. v. P.A.T. Homes, Inc.*, 547 P.2d 1050 (Ariz. 1976)),

[21]  *J.D. Land Co. v. Killian*, 762 P.2d 124, 126 (Ariz. App. 1988); *see Richards Dev. Co. v. Singh*, 358 P.2d 329, 330 (Ariz.  1961).

[21]  *Leo Eisenberg & Co., Inc. v. Payson*, 785 P.2d 49, 52 (Ariz. 1989).

should have examined the available extrinsic evidence in deciding whether the CC&Rs provided for Debtor's use of parking in the parking structure without any payment.

As this court understands the decision of the bankruptcy court, it interpreted the easement created by the CC&Rs as being limited to the surface parking spaces on the Kierland II property, but that easement did not extend to the additional parking in the parking structure based on its finding that the CC&Rs were not ambiguous on this point. However, because this court finds that an ambiguity existed, resolution of that ambiguity is a factual determination to be resolved by the trier of fact on remand.[22]

### C.  Approval of Post-petition Parking Agreement

After considering the extrinsic evidence, the bankruptcy court may not change its interpretation of the easement provided in the CC&Rs, so it is necessary to consider the bankruptcy court's treatment of the post -petition parking agreement.  It is undisputed that at the time the bankruptcy petition was filed, no cost-sharing agreement existed between Debtor and Kierland II regarding the costs incurred in erecting the parking structure on the Keirland II property or the subsequent costs associated with its operation.  To rectify what Debtor and Kierland II perceived to be a material deficiency, they entered into a cost-sharing agreement requiring Debtor to reimburse Kierland II for a proportionate share of the cost of constructing the parking garage.  JPMMC challenges the Bankruptcy Court's approval of this agreement.  This issue is a mixed question of law and fact, subject to *de novo* review.[23]  According to Debtor, Debtor's

---

[22] *Hartford v. Industrial Comm'n of Ariz.*, 870 P.2d 1202, 1207 (Ariz. App. 1994); *see In re Estate of Lamparella*, 109 P.3d 959, 963 (Ariz. App. 2005)

[23]  *See Conrad v. Ace Prop. & Cas. Ins. Co.*, 532 F.3d 1000, 1004 (9th Cir. 2008).

property has either 76 or 82 parking spaces.  The Kierland II property has 202 or 206 surface parking spaces, plus another 341 located in the parking garage.  Thus, exclusive of the parking garage, Debtor has the use of approximately 283 surface parking spaces, either on its own property or on Kierland II property.  The bankruptcy court noted in its decision that under the easement Debtor was permitted to use the "relatively few" surface parking spaces without further payment to Kierland II.  This court agrees that Debtor is entitled to use the surface parking spaces without payment to Kierland II.  The problem is that the bankruptcy court required Debtor to reimburse Kierland II for approximately 75% of the cost of the parking garage, apparently on the assumption that approximately 75% of the parking garage was to be used by Debtor, but the bankruptcy court did not explain how it arrived at that allocation, an allocation which appears to be incorrect as discussed in the next paragraph.

From the figures provided in Debtor's brief,[24] it appears that Debtor's building is approximately 110,000 ft$^2$, and the building code requires 3.5 parking spaces per thousand square-feet.  Thus, about 385 parking spaces must be available for Debtor's tenants.  The difference between the available surface spaces and the required spaces is approximately 102 parking spaces.  Thus, of the 341 parking spaces available in the parking garage, approximately 102 (30%) are necessary for Debtor's use.  This is considerably less than the 75% share of costs imposed on Debtor by the parking agreement.

---

[24] This Court uses these figures for illustration.  They should not, indeed may not, be used as findings of fact binding in this matter.

Resolution of this issue on the record before this court is impossible.  There is no evidence to show how many surface parking spaces were available for use by Debtor's tenants on the Kierland II property prior to erection of the second office building.  That number is essential to a determination of how many spaces would be needed in the parking garage to satisfy applicable parking regulations.  What the bankruptcy court appears to have overlooked is the fact that *until Kierland II erected the second office building there was no apparent necessity for additional parking, let alone a parking garage.*  This proposition which is at least consistent with the record suggests that the necessity for the construction of the parking garage might have been *solely* a result of the construction of the second office building by Kierland II.

Bankruptcy is an equitable proceeding.[25]  It may be equitable to require Debtor to reimburse Kierland II for the reasonable value of constructing additional parking needed to meet *Debtor's* parking requirements, it would not be equitable to require Debtor to contribute to the cost of erecting parking spaces for the use of Kierland II.  Debtor and Kierland II may be likened to pockets in a pair of pants owned by Bataa Oil.  It is inequitable to permit the transfer of funds from one pocket in a pair of pants (Debtor) to the other pocket (Kierland II) simply to prevent the funds from being taken by the person to whom they are owed (JPMCC) for the ultimate benefit of the owner of the pants (Bataa Oil).

---

[25] *Young v. United States*, 535 U.S. 43, 50 (2002) ("bankruptcy courts . . . are courts of equity and appl[y] the principles and rules of equity jurisprudence.") (alteration in the original) (*quoting Pepper v. Litton*, 308 U.S. 295, 304 (1939) (internal quotation marks omitted)).

D.  *Valuation of JPMCC's Secured Claim*

The bankruptcy court accepted Debtor's base valuation of the property, $12.5 million, reduced that to $7.7 million to account for JPMCC's proportionate share of the cost of erecting the parking structure on Kierland II property.[26]  JPMCC does not challenge the "base" FMV appraisal by the Debtor's expert, $12.5 million dollars.[27] JPMCC does challenge reducing that value by the amount of the alleged obligation of Debtor to reimburse Kierland II for 75% of the cost of constructing the parking garage.[28] Even if debtor must compensate Kierland II for the use of the additional parking spaces in the parking garage, as explained below, that would not reduce the value of JPMCC's secured claim.  Additionally, the pass-through of the revenue generated from the use of the additional parking spaces may be sufficient compensation for their use.

The threshold issue involves the nature of Kierland II's "claim."  Debtor scheduled Kierland II as a creditor holding a $4,168,000 contingent/unliquidated/disputed claim.[29]   It does not appear from the record that Kierland II filed a proof of claim.  The manner in which this "claim" was effectively

---

[26]  In so doing, the Bankruptcy Court effectively treated Kierland II's unfiled, unsecured claim as a senior secured claim contrary to be hierarchal treatment of claims inherent in the Bankruptcy Code.  *See* 11 U.S.C. § 507.

[27]  Indeed, a contrary position would be futile.  *See Tuma v. Firstmark Leasing Corp.* (*In re Tuma*), 916 F.2d 488, 491 (1990) (holding bankruptcy judge's determination was not clearly erroneous even though there were many different methods of determining value).

[28]  Puzzling is the fact that there are three different figures utilized in accounting for Debtor's proportionate share of the cost of the parking structure:  $4.17 million on Debtor's schedules; $4.8 million used by Debtor's appraiser; and $5.16 million in the agreement between Debtor and Kierland II.

[29]  The reason for a "negotiated" amount nearly a million dollars greater also remains a mystery.

allowed was inconsistent with the requirements of the Bankrupcty Code.  First, it should have been disallowed as a matter of law.[30]  Second, even not disallowed, it was at most an unsecured claim.  There is no evidence that Kierland II's "claim" constituted a lien on Debtor's property, including Debtor's interest in the easement in the existing parking on the Kierland II property.  Nor, because the claim arose, if at all, prior to the date the bankruptcy petition was filed can it be considered an allowable expense of estate administration.[31]  Consequently, by reducing JPMCC's secured claim by the amount of to be paid to Kierland II, it appears that the bankruptcy court treated Kierland II's "claim" as a senior encumbrance.[32]

### E.  Re-characterization of Inter-company Transactions/New Value

At issue is $14.9 million representing transfers from Debtor to Bataa Oil over a period of time initially booked on Debtor's books as receivables that were eliminated by reclassifying them as equity distributions.[33]  According to the testimony of Debtor's bookkeeper the inter-company transfers were determined to have been initially erroneously booked as a loan to Bataa Oil, and they were reclassified as equity

---

[30] Fed. R. Bank. P. 3003(c)(2) ("Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.").

[31] 11 U.S.C. § 503.

[32] In delaying payment, other than interest, until after the plan had been consummated, it might be said that technically the distribution was not being made "under the plan;" therefore it would not violate Rule 3003(c)(2).

[33]  The bankruptcy court had authority to make this determination.  *See Official Committee of Creditors v. Hancock Park Capital II, L.P.* (*In re Fitness Holdings Intern., Inc.*) 714 F.3d 1141, 1148 (9th Cir. 2013).

distributions without explanation except that it was done on the advice of the CPA.[34]  In

the CPA's deposition testimony read into the record at the evidentiary hearing on the

proposed plan, when asked if he told the bookkeeper  to make a change in the books of

Debtor and Bataa Oil, his response was:  "Not that I can recall.  No, not that I

remember."[35]  At the hearing the Bankruptcy Court observed in connection with the new

value argument:

> I am however, still very troubled with the argument that this is truly
> new value.  I don't think I really heard any competent evidence on the nature
> or the effect of the re-characterization that apparently occurred only on the
> Debtor's books and not on Bataa/Kierland's [*sic* Bataa Oil's ?] books.  And
> I have a real problem with an argument based solely on the bookkeeper's
> testimony that on the one hand she says it was recognized by an accountant,
> and the accountant says, "No. He didn't recommend that"  Frankly, says he
> never even analyzed it.  Because to him the way it had been accounted for
> made no difference.  I can understand that analysis. But I didn't understand
> his testimony to be, "And it would make no different if you re-characterized
> it."  I didn't hear him opining on that at all.  Therefore I am still very troubled
> by the idea that at least according to Bataa/Kierland's [*sic* Bataa Oil's?]
> books it apparently still owes the Debtor millions of dollars.
>
> That testimony appears to be un-contradicted.  That is based on
> Bataa/Kierland's [*sic* Bataa Oil's?] books.  And how, given that as apparently
> an uncontested fact, how possibly can any money it contributes to the Debtor
> be called new money?[36]

In confirming the plan, the Bankruptcy Court ultimately found:

> Aside from the fact of how the 2007 distribution had been reported on
> the Debtor's and Bataa's balance sheets, no evidence was presented by
> anyone that there actually had been a loan or a debt.  Anne Cline [*sic*], who
> acted as the Debtor's bookkeeper when the bookkeeping change was made
> in 2009, had not been responsible for the books in 2007, and testified she
> made the change on the recommendation of the Debtor's accountant.  She
> testified it was made only to correct a mistake, not to make a change of any

---

[34]  D.t. 19-5 at 29.

[35]  Dkt. 19-6 at 8.

[36]  Decision re: Confirmation of Amended Plan [D.t. 19-6 at 9].

financial significance.  Although such testimony may not be highly reliable or credible, the Lender presented no evidence to demonstrate that there ever had been a loan by the Debtor or a debt owed to the Debtor by Bataa Oil. Nor was there any evidence presented by the Lender that it ever relied on a Debtor's balance sheet as showing a significant asset in the form of a receivable from Bataa Oil, which the Lender would have been expected to be able to provide if it had any valid reason to believe that the proposed contribution was not really "new."

Moreover, the evidence is uncontroverted that the original lender agreed in 2007 that the Debtor could distribute to its equity owners $9.6 million of the loan proceeds.  Given the significantly deteriorated and deteriorating real estate market in 2007, and the fact that the Debtor would still have a debt to the lender for the amount of any such distribution for which it received no valuable asset in exchange, there is a significant likelihood that the distribution rendered the Debtor balance sheet insolvent. There is no evidence that the original lender's authorization for that distribution was conditioned upon proof that the Debtor would not thereby be rendered insolvent, or that the "distribution" could only be in the form of a loan (and if the lender had so required, it probably also would have required that the loan be documented, which it was not).  In short, it appears that if there were any impropriety in the 2007 distribution such as a fraudulent transfer, the lender aided and abetted that impropriety.  Equitable doctrines such as estoppel and unclean hands therefore now bar the creditor standing in the shoes of the original lender -- the only objector to the plan -- from arguing that the money Bataa Oil is now contributing is not new.  It would be at least ironic if the Lender could use a transaction that it authorized and facilitated to prevent a debtor from reorganizing for the benefit of both its secured and unsecured creditors, many of whom might have been substantially injured by the very transaction the Lender now seeks to wield as a sword to prevent the reorganization.

Considering all the facts that were established by competent testimony, the fact that the contribution is at least facially "new" as of the confirmation hearing because it is an asset that was not on the Debtor's balance sheet as of the date of the petition, the absolute lack of any evidence that the balance sheet recharacterization in 2009 was a "transfer" of anything, and the failure of the lender to present any evidence (as distinct from lawyer argument) relevant to showing that it was not new money, the Court must find and conclude that the contribution is "new."

The Court therefore finds that the plan satisfies the new value corollary to the absolute priority rule, and therefore is fair and equitable.  And based on these findings and conclusions, the Court denies as moot the

Debtor's motion to reopen the evidence on the lack of any loan or obligation to Bataa Oil.[37]

The bankruptcy court's reliance on the lack of any evidence that the re-characterization constituted a "transfer" appears insufficient.  Whether a particular event is a transfer for bankruptcy purposes is a matter of federal law,[38] and the Bankruptcy Code defines a "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with— [¶] (I) property; or [¶] (ii) interest in property."[39]  This definition is extremely broad.[40]  The crux of the definition is that the debtor no longer has the rights that the debtor possessed prior to the event.[41]  It cannot be argued that an account receivable is not a property interest under Arizona law.  Thus, to the extent Debtor had any right in the inter-company receivable its extinction by re-characterizing it as a return of equity constituted a transfer.  The question becomes: Was the inter-company transaction initially booked as a receivable properly booked?  The bankruptcy court, accepting the testimony of the bookkeeper, effectively held that it was not but her testimony was clearly inadequate to support that conclusion.

---

[37] *Id.* [D.t. 19-4 at 12–13].

[38] *Barnhill v. Johnson*, 503 U.S. 393, 397-98 (1992).

[39] 11 U.S.C. § 101(54).

[40] *Batlan v. Bledsoe* (*In re Bledsoe*) 569 F.3d 1106, 1113 (9th Cir. 2009); *see Bernard v. Sheaffer* (*In re Bernard*) 96 F.3d 1279, 1282 (1996) ("'The definition of transfer is as broad as possible.'" (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813)).

[41] *Towers v. United States* (*In re Feiler*) 218 B.R. 957, 961 (Bankr. N.D. Cal. 1998) *aff'd* 218 F.3d 948 (9th Cir. 2000).

Debtor argues and the bankruptcy court apparently accepted as an alternate basis for the conclusion that the account receivable was actually a distribution of equity the fact that a distribution was specifically authorized by the loan documents.  Debtor points to the Loan Agreement, which provides:

> 2.04   Use of Funds   Borrower hereby warrants, represents that the loan evidenced hereby is for business or commercial purposes only, and no advance of funds evidenced hereby shall be used by borrower for personal, family, agricultural or household purposes. The foregoing shall not, however, prohibit borrower from distributing surplus proceeds (after payment from time to time of all amounts that borrower is required to pay pursuant to the Loan Documents) to the owners of equity interests in Borrower.[42]

Debtor also points to the Borrower's Settlement Statement Final, which provides: "Refund due borrower 9,672,425.94."[43]

Even accepting that the original lender consented to the distribution of surplus loan proceeds to the equity holders does not necessarily mean the lender acceded to treatment of the distribution as a distribution of equity rather than as a loan.  Moreover, the alleged consent does not reach all the distributions.  The "consent" at most extended to $9.7 million.  Yet, there was an additional $5.2 million involved.  Debtor's books also show the re-characterization in two parts: $7 million and $7.9 million, without further explanation.  The logical conclusion is that there were at least two separate distributions, at least one of which likely cannot be logically tied to the initial lender's consent to the distribution of "surplus" funds, even if that consent could support the conclusion that the distribution necessarily was a distribution of equity.

_____

[42]  Docket No. 35-2 at 12.

[43]  Docket No. 33-1 at 47.

This court also notes that the re-characterization was not made in 2009, but at the end of 2010, just over two months before the petition was filed.[44]  There is no evidence in the record other than the uncorroborated-indeed contradicted–testimony of the bookkeeper for the re-characterization.  And there is no evidence in the record beyond the less than satisfactory reliance on the original lender's approval to support any error in the original treatment as an account receivable.  Finally, there is no explanation for the continued treatment of the transfers as loans on the books of Bataa Oil.  The bankruptcy court's conclusion on this point does not withstand scrutiny on the available record.  Weighing all of the evidence, creates a definite and firm conviction that the bankruptcy court's finding of fact was mistaken on the record before it.  This is very significant, because if JPMCC were to prevail on a more complete record, Bataa Oil would be compelled to repay Debtor several million dollars, a sum far in excess of the $350,000 contribution actually made by Bataa Oil.[45]

In sum, the bankruptcy court's decision deprives the creditors of millions to the benefit of the equity holder based upon less than adequate credible evidence.  Approval of the plan on the available record simply fails the "fair and equitable" test.[46]  The bankruptcy court denied JPMCC's motion to reopen the evidence as moot, effectively

---

[44]  If so, then this case presents a fraudulent transfer question.  *See* 11 U.S.C. § 548(a)(1)(B) (a transfer without consideration by an insolvent debtor).  That is, if Debtor was not already insolvent, the elimination of a $14.9 million receivable certainly rendered it so.  11 U.S.C. § 101(32).  This question is incapable of answer on the record before this Court, and must, if otherwise appropriate, be determined by the Bankruptcy Court on remand.

[45]  This court agrees with JPMCC that this $350,000 contribution, at most less than two percent (2%) of the discharged debt is *de minimus.  See Liberty Nat'l Enter. v. Ambanc La Mesa Ltd P'ship* (*In re Ambanc La Mesa Ltd P'ship*), 115 F.3d 650, 654–56 (9th Cir. 1997).  That too is an issue that the Bankruptcy Court must address on remand if necessary.

[46]  *See* 11 U.S.C. § 1129(b)(1).

precluding full development of the record.  Consequently, on remand, the bankruptcy court should reopen the record and take such additional evidence as may be necessary or appropriate to resolve this issue.

### F.  Property Taxes

As an ongoing expense during the life of the plan, Debtor is required to pay Kierland II the common expenses associated with the parking garage, including its proportionate share of the real property taxes.  As Debtor correctly points out, the CC&Rs specifically exclude property taxes from those items of common expenses that Debtor agreed to pay.  This does not, however, necessarily insulate Debtor from all property taxes, only those associated with the number of parking spaces covered by the reserved easement.  To the extent that the construction of the parking garage increased the number parking spaces to which Debtor was entitled, as discussed in subpart III.C., above, the common expenses for which Debtor is responsible is not governed by the CC&Rs.  This, as with the number of additional parking spaces, if any, for the use of which Debtor must pay Kierland II, is left to the bankruptcy court to determine in the first instance on remand.

### G.  Use of the Cash Collateral

At the time of confirmation, Debtor held $729,467.44 in net cash collateral.  The Bankruptcy Court allowed Debtor to retain these proceeds, treating them as part of JPMCC's secured claim.[47]  This issue is reviewed de novo.[48]

---

[47] Adding it to the $7.7 million the bankruptcy court determined was the fair market value of the property securing JPMCC's debt.

[48] *Arnold & Baker Farms v. United States*, (*In re Arnold & Baker Farms*) 85 F.3d 1415,
(continued...)

In permitting Debtor to retain the cash collateral proceeds post-confirmation, the

Bankruptcy Court held:

> The Lender objects that the plan does not require the Debtor to turn
> over all of its cash collateral to the Lender.  This objection is without merit
> because there is no such requirement in the Code.
>
> Cash collateral is a debtor's property, in the form of cash, that secures
> a lender.  Nothing in Code §§ 1123 or 1129 requires that the collateral be
> surrendered to the lender, any more than they require a surrender of the real
> property (although surrender of the property is an *alternative* under
> § 1129(b)(2)(A)(iii), which the Supreme Court recently clarified in its *RadLAX*
> decision,[3] but which the Debtor's plan does not utilize).  Rather, § 1129 can
> be satisfied if the lender retains its lien while the debtor retains the use of the
> collateral so long as the lender is paid the present value of its secured claim.
> Section 506 certainly requires, as made clear by the Ninth Circuit in
> *Ambanc*,[4] that the value of the cash collateral be added to the value of the
> real property collateral to determine the *amount* of an undersecured claim.
> But nothing in *Ambanc* or in §§ 363, 506 or 1129 requires a turnover of the
> cash collateral.[49]
>
> ___
>
> [3] *RadLAX Gateway Hotel LLC. v. Amalgamated Bank*, ___ U.S. ___,
> 132 S. Ct.205 (2012) (the third alternative under § 1129(b)(2)(A) is to provide
> a creditor with the "indubitable equivalent" of its secured claim, which might
> be achieved via a surrender of the property to the secured creditor).
>
> [4] *In re Ambanc La Mesa P'ship*, 115 F.3d 650 (9th Cir. 1997).

This court notes that the bankruptcy court's reliance on *Ambanc* was misplaced.

The *Ambanc* bankruptcy court first found that the value of the real property securing the

obligation was $4.3 million, then offset that by the amount of the cash collateral retained

by the secured creditor.  The Ninth Circuit held that, because the total secured claim

included the cash collateral, the conclusion that the secured claim total was $4.3 million,

not $4.6 million, was error.[50]  Here, unlike *Ambanc*, the Debtor, not JPMCC, the

___

[48] (...continued)
1421 (9th Cir. 1996).

[49] Decision re: Confirmation of Amended Plan [D.t. 19-4 at 9].

[50] *Ambanc*, 115 F.3d at 652–54.

creditor, retains the cash collateral.  Because JPMCC was already under-secured, Debtor could not provide substitute security for the use of the cash collateral.

What escapes explanation is how simply increasing a "secured" claim, which has already been reduced to the value of the collateral leaving no value to secure any additional debt, is the "indubitable equivalent" of nearly three-quarters of a million dollars in cash.  In other words, in the context of the use of the cash collateral, the Bankruptcy Court simply treated it as part of the secured claim for purpose of plan payments.  It does not appear that under the terms of the Plan JPMCC's security interest in the cash collateral survived confirmation.[51]  Even if it did, it does not appear that any provision is made for preserving JPMCC's secured position as the cash is consumed.  The bankruptcy court did not provide any substitute security for payment, i.e., it effectively substituted an unsecured obligation for a secured obligation.  While this constituted error, it is also a matter that may be addressed further on remand taking into consideration the facts presented to the bankruptcy court.

---

[51] Upon confirmation under the plan JPMCC effectively had an allowed "secured claim" of $8,449,467 secured by $7,700 ,000 in assets.

## IV.  ORDER

The order of the bankruptcy court confirming the Plan of Reorganization is hereby **VACATED** and **REMANDED**  to the bankruptcy court for such further proceedings as may be necessary or appropriate consistent with this decision.

The Clerk of the Court is directed to enter judgment accordingly.[52]

Dated:  July 22nd 2013

_____
/S/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

_____

[52]  Fed. R. Bankr. P. 8016(a).